**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Trust Agreement of Steven M. Sushner**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **C.A. Harrison Companies, LLC**, *et al.*, <br><br> Defendants. | Case No. 22-cv-2837 (CRC) |

<u>**MEMORANDUM OPINION & ORDER**</u>

Plaintiff Trust Agreement of Steven M. Sushner ("Sushner") has sued real estate developer Christopher Harrison and his company over an investment in an apartment building venture in North Carolina. Before the Court is Sushner's motion to amend his initial complaint. For the reasons explained below, the Court will green light Sushner's proposed federal RICO Act claim, two of his proposed common law fraud claims, and a breach of contract claim. The Court rejects as futile another fraud claim and two claims of "embezzlement."

**I.    Background**

Unless otherwise indicated, the Court draws the following background from the allegations in the proposed amended complaint, which the Court must accept as true in deciding whether to permit the amendment.

This case centers on a project to redevelop a former tobacco plant in Winston Salem, North Carolina into an apartment building called Plant 64 Lofts. Proposed Amended Complaint, ECF No. 19-1 ("Am. Compl.") ¶ 1. In 2012, Steven Sushner was solicited to join four existing investors in a District of Columbia limited liability company—Plant 64 DCMC LLC ("Plant 64 DCMC" or "the LLP")—that local real-estate entrepreneur Christopher Harrison had formed to

develop the Plant 64 Lofts project.  Id. ¶¶ 1–2, 11, 58–59.  Mr. Harrison's company Christopher A. Harrison, LLC ("CAH") served as the managing member of Plant 64 DCMC and Harrison, in turn, is the sole owner and managing member of CAH.  Id. ¶¶ 13–14.  Mr. Sushner, through the Steven M. Sushner Trust, made a $50,000 capital contribution to Plant 64 DCMC in exchange for a 1.65% ownership share, which was later upped to 2.5% following an additional allocation of previously undistributed ownership interests.  Id. ¶¶ 58, 60, 68.

Fast forward eleven years.  Plant 64 Lofts was sold earlier this year for $83.5 million in what was reported as the largest apartment complex transaction in the history of the Winston-Salem area.  See Richard Craver, Downtown Winston-Salem's Plant 64 Sold for $83.5 Million; Largest Apartment Complex Deal in Forsyth History, Winston-Salem J. (Mar. 10, 2023), https://perma.cc/UW8R-WFKD.  One might think Mr. Sushner would have emerged from that transaction satisfied by the substantial return on his initial investment.  One would be mistaken.  Far from content to count his pennies, Sushner alleges in this lawsuit, filed soon before the sale, that Harrison[1] perpetrated a decade-long fraud to steal funds from the LLC and secretly inflate his equity in the project to the detriment of Sushner and the other investors.  According to Sushner's proposed amended complaint, the fraud took several forms.

First, Sushner alleges that in 2011 and 2012, before he joined Plant 64 DCMC, Harrison embezzled from the LLC by withdrawing investor funds from its bank account and diverting them for his personal use and the use of CAH.  See Am. Compl. ¶¶ 33–52.  As to some would-be investors, Sushner alleges on information and belief that Harrison took their funds but failed to give them a stake in the venture or return their money.  See id. ¶ 53.

---

[1]  For ease of reading, the Court will refer to Plaintiff Sushner Trust as "Sushner" and Defendants CAH and Harrison collectively as "Harrison" unless necessary to distinguish a particular entity.

Second, Sushner claims that Harrison fraudulently induced him and the other LLC members to invest in Plant 64 DCMC by misrepresenting in the LLC's operating agreement that CAH had made a $250,000 cash contribution and assigned its interest in a related development company to the LLC.  Id. ¶¶ 61, 63.  Those purported contributions entitled CAH to a 33.33% ownership interest.  Id. ¶ 64.  In fact, says Sushner, there had been no cash contribution, and the assignment was worthless because CAH had no ownership interest in the development company at the time of the purported assignment.  Id. ¶¶ 62, 66.

Third, in August 2013, Harrison sought approval from the other Plant 64 DCMC members to transfer the LLC's right to purchase the Plant 64 property to Innovation Lofts Associates, LLC, an affiliate of the Philadelphia-based multi-family real estate developer Pennrose.  Id. ¶ 70; see Craver, supra.  Harrison sent the members a proposed operating agreement indicating that the LLC would receive a 19.75% passive interest in Innovation Lofts. Id. ¶ 73(c).  According to Sushner, however, Harrison manipulated the version of the operating agreement he sent to conceal the fact that he had executed an earlier agreement that gave Plant 64 DCMC a 24.75% stake in Innovation Lofts.  Id. ¶¶ 71, 73.  The new agreement, says Sushner, therefore reduced the LLC's stated interest in Innovation Lofts by 5%.  Id. ¶ 72.  What's more, Sushner claims, Harrison also concealed through the "doctored" operating agreement he sent to the LLC members that (1) Harrison and Pennrose would reap a multi-million dollar development fee that was prioritized over distributions to the LLC; (2) Harrison would receive an additional 4.2% equity share in Innovation Lofts through a stake in one of its constituent entities; and (3) the LLC's equity in Innovation Lofts would be further reduced by a commensurate percentage. Id. ¶¶ 73, 76.

Fourth, Sushner alleges that from 2017 to 2022, after the project became operational, Harrison distributed millions of dollars from Plant 64 DCMC to himself, while doling out little to nothing to other members.  See, e.g., id. ¶ 82 (alleging that in 2017 Harrison distributed $1,080,622 from the LLC to himself while paying the other members nothing).  To conceal these large distributions, Harrison allegedly sent false K-1 forms to the LLC members each year throughout this period indicating that the venture had generated no net rental real estate income, while Plant 64 DCMC's corresponding federal tax returns (which Harrison did not provide LLC members) showed substantial net rental income for most years.  Id. ¶¶ 79–106.

Sushner filed his initial complaint in this Court in September 2022.  ECF No. 1 ("Compl.").  It asserted 29 claims against CAH and Harrison for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq., federal and D.C. securities fraud statutes, and for fraud, breach of fiduciary duty, and breach of contract under D.C. common law.  Compl. ¶¶ 16–212.  Harrison filed an answer in November 2022 and followed in February 2023 with what he styled a "Motion to Dismiss Pursuant to Rule 12(c)." See ECF Nos. 6, 11.[2]  After that motion was fully briefed, Sushner moved for leave to amend the complaint, attaching the proposed amendment but no redlined version comparing the two complaints.

The proposed amended complaint is filed directly by the Steven M. Sushner Trust and as a derivative action on behalf of Plant 64 DCMC LLC.  See Fed. R. Civ. P. 23.1 (permitting a shareholder to bring an action to enforce a right that that the corporation may have but has failed to enforce).  The 29 claims in the original complaint have been winnowed down to eight, all

---

[2]  Rule 12(c) motions are properly styled as motions for judgment on the pleadings rather than motions to dismiss.

based on the general allegations cataloged above.  Count 1 alleges an overarching RICO violation (see Am. Compl. ¶¶ 125–44); Counts 2 and 4 allege fraud in the inducement and fraud in procuring Harrison's development fee from the LLC (see id. ¶¶ 145–52, 159–63); Counts 3 and 7, which are plead as "alternatives" to the RICO claim, allege fraud and/or unjust enrichment in connection with other various aspects of the business dealings described above (see id. ¶¶ 153–58, 182–90); Counts 5 and 6, also plead as "alternatives," charge "embezzlement" related to Harrison's alleged diversion of investor funds in 2011 and 2012 and his receipt of distributions from 2017 to 2021 (see id. ¶¶ 164–81); and Count 8 alleges breach of Plant 64 DCMC's operating agreement stemming from Harrison's purported failure to pay preferred distributions to the LLC members (see id. ¶¶ 191–95).  The amended complaint jettisons the securities fraud claims in the original complaint.

While the essential theories of liability set forth in the amended complaint mirror those in the initial complaint (except for the removed securities fraud claims), its factual allegations are considerably more detailed.  Sushner explains that he has been able to beef up the complaint allegations with information from financial records obtained through discovery in a separate books-and-records action that he is litigating against Harrison in the D.C. Superior Court.  See Tr. Agreement of Steven M. Sushner v. C.A. Harrison Cos., 2021-CA-003423-B (D.C. Super. Ct. 2021).

Harrison opposes the motion for leave to amend on grounds of undue delay, prejudice, and futility.  Defs.' Opp'n at 5–14.  The motion is fully briefed and ripe for decision.  In assessing the motion, the Court has considered the arguments presented in both Harrison's motion to dismiss the original complaint and his opposition to the motion for leave to amend.

## II.   Legal Standards

Federal Rule of Civil Procedure 15(a)(2) allows a plaintiff to file an amended complaint

more than 21 days after an answer has been served only with the opposing party's consent or

with leave of court.  Leave to amend a complaint is to be "freely given when justice so requires,"

but may be denied due to "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment," or "futility of amendment."  Foman v.

Davis, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).  The defendant has the burden

of showing that leave to amend should be denied.  See, e.g., Smith v. Café Asia, 598 F. Supp. 2d

45, 48 (D.D.C. 2009).

Because an amended complaint is futile if it would not survive a motion to dismiss,

courts assess proposed amendments under the standards of Federal Rule of Civil Procedure

12(b).  Moldea v. N.Y. Times Co., 22 F.3d 310, 319 (D.C. Cir. 1994).  Harrison here asserts that

the proposed amendments fail to state a claim, so Rule 12(b)(6) applies.  Under that rule, a

complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief

that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is plausible

on its face if it "pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  Id.  The court "assumes the truth of all well-

pleaded factual allegations in the complaint and construes reasonable inferences from those

allegations in the plaintiff's favor but is not required to accept the plaintiff's legal conclusions as

correct."  Sissel v. U.S. Dep't of Health & Hum. Servs., 760 F.3d 1, 4 (D.C. Cir. 2014) (internal

citation omitted).

### III.  Analysis

The Court begins with Harrison's threshold contentions that granting leave to file the amended complaint would result in undue delay and prejudice.  It then assesses whether each of the proposed new claims is futile.

A.  Undue Delay

Harrison urges the Court to reject the proposed amendment because Sushner waited to seek leave to amend until after Harrison's motion to dismiss was fully briefed.  Defs.' Opp'n at 5.  The motion to dismiss became ripe on March 9, 2023, and Sushner moved for leave to amend on May 16, 2023.  That lag, Harrison says, constitutes undue delay.  The Court disagrees.

Courts routinely grant leave to amend when discovery of new facts enables plaintiffs to bolster or refine their complaint allegations.  See, e.g., 2910 Ga. Ave. LLC v. District of Columbia, 312 F.R.D. 205, 213 (D.D.C. 2015).  That is the thrust of the proposed amendments here.  As noted above, Sushner filed a books-and-records action against Harrison in D.C. Superior Court.  Through that action, Sushner has managed to unearth financial statements, tax filings, and other records that he has used to augment his claims, most of which he is required to plead with specificity under Federal Rule of Civil Procedure 9(b).  Nothing before the Court suggests that Sushner has dragged his feet in pursuing this discovery.  To the contrary, the record of the Superior Court case reveals that Sushner's efforts have been met with resistance rising to contempt on the part of Mr. Harrison, such that fault for any delays in production likely lies with him.  See Order at 5, Tr. Agreement of Steven M. Sushner v. C.A. Harrison Cos., 2021-CA-003423-B (D.C. Super. Ct. Oct. 13, 2022) (noting in granting Sushner's motion for default judgment that "Defendants' misconduct has placed an intolerable burden on a [] court by requiring the court to modify its own docket and operations in order to accommodate the delay")

(internal quotation marks omitted); Order, <u>Tr. Agreement of Steven M. Sushner v. C.A. Harrison</u> <u>Cos.</u>, 2021-CA-003423-B (D.C. Super. Ct. Dec. 8, 2022) (granting Sushner's motion to hold Harrison in civil contempt due to his continuing delay and imposing a civil fine of $5,000 per day until all records were produced); Order, <u>Tr. Agreement of Steven M. Sushner v. C.A.</u> <u>Harrison Cos.</u>, 2021-CA-003423-B (D.C. Super. Ct. Mar. 14, 2023) (ordering all LLC members except CAH to select a new independent manager of Plant 64 DCMC unaffiliated with Harrison or any of his affiliates).  Accordingly, the proposed amendment is not the product of undue delay.

B.  <u>Undue Prejudice</u>

Harrison next contends that allowing the amendment would be unduly prejudicial for three reasons: (1) Sushner has filed multiple lawsuits against Harrison and CAH and this one only adds to the defendants' litigation expense; (2) too much time has passed since the conduct from 2011 to 2012 described in the additional allegations; and (3) Sushner's failure to include a redlined copy of the amended complaint with his motion has made defending the new allegations more difficult.  None of these arguments support a finding of undue prejudice.

1.  *Sushner's Other Lawsuits*

Harrison maintains that the continuation of the Superior Court books-and-records lawsuit, as well as another proceeding instituted by Sushner over an investment in a different project, results in undue prejudice because Harrison is "unfairly burdened, financially and otherwise, by having to defend three different and overlapping lawsuits."  Defs.' Opp'n at 5–6.  Harrison further contends that Sushner should have amended the complaint in the books-and-records action, or filed another case in Superior Court that could have been consolidated with it, instead of bringing this completely separate action.  <u>Id.</u>  But these arguments go to the filing of this

lawsuit in the first place rather than the proposed amendments now before the Court. And while Harrison no doubt expended resources briefing the motion to dismiss the original complaint, the Court has considered the arguments presented in the motion to dismiss in assessing the viability of the proposed amendments, which would not be allowed to proceed if they could not withstand those arguments.

Moreover, nothing required Sushner to bring all three suits as one action, especially since they are predicated on different facts and seek relief under different causes of action. The first Superior Court suit, discussed above, seeks corporate records under D.C. law. In the second Superior Court suit, Sushner alleges that Harrison violated state common law when he solicited $50,000 from him for a similar project to convert a tobacco facility in Richmond, VA into a residential building but neither made Sushner an LLC member nor returned his funds. See Compl., Tr. Agreement of Steven M. Sushner v. C.A. Harrison Cos., 2021-CA-003401-B (D.C. Super. Ct. filed Sept. 24, 2021). And this suit includes a federal RICO claim, which must be brought in a United States District Court under 18 U.S.C. § 1964(c) and therefore could not have been plead in either of Sushner's local actions. The overlap in these lawsuits is thus minimal and Harrison is not unduly prejudiced by having to litigate them separately.

        *2. Passage of Time*

Harrison next argues that the amended complaint's addition of allegations dating from 2011 and 2012 unduly prejudices his ability to defend the case. Defs.' Opp'n at 8 (citing "faded" memories and the volume of records produced in the Superior Court books-and-records case). This argument misses the mark. As will be discussed further below, Harrison contends that Sushner's RICO claim falls outside the Act's four-year statute of limitations. Id. at 9. Sushner responds that Harrison fraudulently concealed his alleged misdeeds, thereby tolling the

limitations period.  See Pls.' Reply at 14–15; see also Riddell v. Riddell Wash. Corp., 866 F.2d 1480, 1491 (D.C. Cir. 1989).  If Sushner's RICO claim proves to be time-barred, then any prejudice due to the passage of time will be cured.  But Harrison cannot be heard to complain about defending the case if the facts ultimately support Sushner's fraudulent concealment allegations.  Because the Court must accept the amended complaint as true at this stage, it would be inappropriate to deny amendment based on the purported staleness of the new allegations.

### 3.  Procedural Defects

Last, Harrison decries two purported deficiencies in Sushner's pleadings.  He faults Sushner for the delayed filing of a memorandum of points and authorities in support of his motion for leave to amend and for the lack of an accompanying redlined version of the proposed amended complaint.  See Defs.' Opp'n at 13–14.  While these irregularities may have run afoul of this Court's local rules or standard practices, they don't come close to creating a level of prejudice requiring denial of the amendment.

### C.  Futility

The Court now moves to Harrison's contention that permitting the proposed amended complaint would be futile because it would not survive a motion to dismiss.  The Court begins with Harrison's argument that Sushner lacks standing to bring a derivative claim on behalf of Plant 64 DCMC before turning to the viability of each claim in the amended complaint.

### 1.  Standing to Bring a Derivative Action

To bring a derivative action in federal court, a plaintiff must meet the requirements of Federal Rule of Civil Procedure 23.1.[3]  Rule 23.1(a) requires that a plaintiff bringing a derivative

---

[3]  The proposed amended complaint mistakenly references compliance with D.C. Superior Court Rule 23.1, see Am. Compl. ¶ 29, but the requirements are the same for both the federal and local

action "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."  This rule is designed to "prevent shareholders from suing in place of the corporation in circumstances where the action would disserve the legitimate interests of the company or its shareholders."  Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 532 n.7 (1984).  It is uncontested that Sushner became a member of Plant 64 DCMC in April 2012 and remained a member when both the original complaint and the amended complaint were filed.  Am. Compl. ¶¶ 27, 58–59.  To contest a member plaintiff's standing to bring a derivative action, the defendant bears the burden of establishing that the plaintiff is not a fair and adequate representative of similarly situated members.  Saunders v. Hankerson, 312 F. Supp. 2d 46, 69 (D.D.C. 2004) (citing Levant v. Whitley, 755 A.2d 1036, 1049 (D.C. 2000)).  Harrison has not met that burden here.

Harrison contends that Sushner is not an adequate representative because all LLC members, including Sushner, have netted substantial returns on their original investments from the sale of the Plant 64 property.  See Defs.' Opp'n at 6–7.  But this contention fails to show any conflict between Sushner's interests and those of Plant 64 DCMC or the other LLC members.  Nor does it defeat Sushner's allegations of rampant fraud.  The crux of the claim is not that Sushner lost money but rather that he (and the other investors) did not profit as much as they were entitled to because of Harrison's conduct.  If anything, that Sushner has received returns on the same order of magnitude as the other investors goes only to show that they are similarly situated.

---

rules.  See Saunders v. Hankerson, 312 F. Supp. 2d 46, 69 (D.D.C. 2004) (citing Levant v. Whitley, 755 A.2d 1036, 1049 (D.C. 2000)).

Nor does Sushner's relatively small interest in the LLC disqualify him from representing its interests.  See id.  There may be some situations where a shareholder's very small ownership will derail a derivative suit.  See, e.g., Smith v. Ayres, 977 F.2d 946, 948–49 (5th Cir. 1992) (finding that a party-plaintiff who held 1/10,000,000 of company's authorized shares was not a fair and adequate representative of shareholder interests).  But that factor is usually irrelevant. See, e.g., Subin v. Goldsmith, 224 F.2d 753, 761 (2d Cir. 1955); see also Wright and Miller, 7C Fed. Prac. & Proc. Civ. § 1833 (3d ed.), n.15 (collecting cases).  The absence of other members as plaintiffs, Defs.' Opp'n at 7, is also insufficient to demonstrate that Sushner does not adequately represent the interests of the LLC given that the purpose of a derivative action is to allow a shareholder to sue when the majority has voted not to.  Shulman v. Ritzenberg, 47 F.R.D. 202, 211 (D.D.C 1969).  Harrison's assertion that the larger investors "have a greater incentive than Mr. Sushner to try to recoup any losses," Defs.' Opp'n at 7, only supports the conclusion that this suit serves the interests of the other members of the LLC.  If Sushner succeeds in proving his derivative claims and obtaining relief on behalf of the company, the other members of the LLC could benefit handsomely.

Sushner's "multiple related lawsuits" do not undermine his derivative action either.  See id.  To be sure, where a suit's purpose is to gain control of the company or the plaintiff is simultaneously seeking to recover personally against it, the plaintiff may not maintain a derivate action consistent with Rule 23.1.  See, e.g., Bender v. Parks, No. 03-cv-2485 (RMC), 2004 WL 3737124, at *3 (D.D.C. Jan. 15, 2004) (noting that shareholders have been disqualified as derivative plaintiffs where (1) "'economic antagonism' exists between a potential derivative plaintiff and other shareholders" or (2) a "plaintiff's primary purpose in instigating [the] action is the acquisition of a controlling interest") (citing Pacemaker Plastics Co. v. AFM Corp., 139 F.

Supp. 2d 851, 855–56 (N.D. Ohio 2001); Torchmark Corp. v. Bixby, 708 F. Supp. 1070, 1077–78 (W.D. Mo. 1988)).  But Sushner's continuing books-and-records suit does not seek financial recovery or additional equity in the LLC.  It merely seeks access to corporate records.  The existence of the suit therefore does not show "economic antagonism" between Sushner and Plant 64 DCMC or its members.

Rule 23.1(b) requires that in addition to being a member of the LLC at the time of the contested transactions, a derivative plaintiff must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  To satisfy Rule 23.1(b)(3), the plaintiff must, "[a]t a minimum . . . plead facts explaining the lack of a demand—it is not enough for plaintiff to state in conclusory terms that no demand was made because it would have been futile."  Wright and Miller, 7C Fed. Prac. & Proc. Civ. § 1831 (3d ed.).  It is usually enough to show that the majority shareholders are the alleged wrongdoers or are otherwise actively involved in the alleged wrongdoing.  See Gaubert v. Fed. Home Loan Bank Bd., 863 F.2d 59, 65 (D.C. Cir. 1988).

Consistent with these requirements, the amended complaint cites the reasons why Sushner did not seek majority approval to bring a direct action on behalf of Plant 64 DCMC.  Am. Compl. ¶¶ 27–29.  Doing so would have been futile, Sushner plausibly explains, because the sole managing member of the LLC and the only member who could bring suit directly on its behalf was Harrison—the alleged wrongdoer.  Id. ¶ 29.  Sushner goes on to allege that he does not have the ability to require Harrison to inform the other members of his request to bring suit, or to call a meeting of the members to seek a majority vote.  Id. ¶ 29(c).  None of these allegations are contested by Harrison.

13

Accordingly, Sushner has satisfied the requirements of Rule 23.1 for a derivative lawsuit and the case may proceed on behalf of Plant 64 DCMC.

### 2. *RICO Claim (Count 1)*

Plaintiffs' sole claim for relief under federal law comes pursuant to § 1962(c) of the RICO Act.  Id. ¶¶ 125–44.  The amended complaint must plausibly state this claim, or the entire amendment is futile, as this Court would otherwise lack jurisdiction over the remaining state-law claims.  Harrison raises two central challenges to the proposed RICO count.  He contends that (1) the amended complaint fails to allege the essential elements of a RICO violation and (2) the allegations from 2011 to 2013 show that Sushner was on inquiry notice of potential fraud and thus the claim is barred by the statute of limitations.  Defs.' Opp'n at 9–13.

### a. Elements of a RICO Violation

"A violation of § 1962(c) of the RICO Act consists of four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  W. Assocs. Ltd. P'ship ex rel. Ave. v. Mkt Square Assocs., 235 F.3d 629, 633 (D.C. Cir. 2001) ("Western Associates") (citing Pyramid Sec. Ltd. v. IB Resol., Inc., 924 F.2d 1114, 1117 (D.C. Cir. 1991)).  The Act "defines the term 'pattern of racketeering activity' as requiring the commission of at least two predicate racketeering offenses over a ten year period."  Id. (citing 18 U.S.C. § 1961(5)).  Harrison contends that the amended complaint "still lack[s] a 'predicate act,' [an] unlawful 'enterprise' separate from the real estate development, or a 'pattern' of improper conduct."  Defs.' Opp'n at 11.  The Court disagrees.

### i) *Enterprise*

Harrison contends there can be no RICO enterprise in this case because his conduct was part and parcel of the Plant 64 real estate development project and "defendants cannot face RICO

14

liability 'for participating in an enterprise comprised only of its agents.'"  Defs.' Opp'n at 12 (quoting U.S. Dominion, Inc. v. MyPillow, Inc., No. 21-cv-445, 2022 WL 1597420, at *5 (D.D.C. May 19, 2022)).  This argument misses the mark.

To successfully plead a RICO "enterprise," the alleged wrongdoers simply must be legally distinct from the enterprise itself.  Confederate Mem'l Ass'n v. Hines, 995 F.2d 295, 300 (D.C. Cir. 1993) ("[T]he same entity cannot be the RICO enterprise and [the] RICO defendant.").  Given that Plant 64 DCMC includes five other members besides CAH and that Harrison could not act on behalf of the LLC without majority approval, Plant 64 DCMC is not "an enterprise comprised only of [Harrison's] agents."  U.S. Dominion, 2022 WL 1597420, at *5 (citation omitted); see also Am. Compl. Ex. 1, Operating Agreement § 6.01(B).  Moreover, Harrison is incorrect to suggest that a RICO enterprise must be unlawful, Defs.' Opp'n at 11, as RICO serves to "protect[] . . . a legitimate 'enterprise' from those who would use unlawful acts to victimize it."  Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001); see also Pls.' Reply at 17–18.  Accordingly, the allegations in the amended complaint plausibly state a RICO enterprise separate and apart from the RICO defendants.

*ii)  Predicate Acts*

Sushner has also adequately alleged at least two predicate acts of racketeering activity. The amended complaint is replete with alleged acts of mail and wire fraud.  Harrison correctly observes that courts are generally skeptical of RICO claims predicated purely on mail and wire fraud.  See, e.g., Western Associates, 235 F.3d at 636–37.  But "a RICO claim may be based only on predicate acts consisting exclusively of mail and wire fraud" so long as the complaint meets Rule 9(b)'s heightened pleading standard.  See id. at 637; Brink v. Cont'l Ins. Co., 787 F.3d 1120, 1127 (D.C. Cir. 2015).

To satisfy this heightened pleading standard, a plaintiff must allege "specific fraudulent statements, who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent."  Brink, 787 F.3d at 1127 (citation omitted).  To plead the elements of mail and/or wire fraud, "each racketeering act must be a mailing or wire transmission made in furtherance of a 'scheme or artifice to defraud.'"  United States v. Philip Morris USA Inc., 566 F.3d 1095, 1116 (D.C. Cir. 2009) (quoting 18 U.S.C. §§ 1341, 1343).  As Sushner notes, "the concept of 'fraud'" in the mail fraud statute "includes the act of embezzlement" because it is "the fraudulent appropriation to one's own use of the money or goods entrusted to one's case by another."  Carpenter v. United States, 484 U.S. 19, 27 (1987) (quoting Grin v. Shine, 187 U.S. 181, 189 (1902)).  And though Harrison complains that Sushner does not allege that he relied on any alleged misstatements, Defs.' Opp'n at 11–12, unlike common law fraud, a plaintiff need not show that he relied on the misrepresentations to assert a RICO claim predicated on mail and wire fraud.  See Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 641–42 (2008).

Sushner has plausibly alleged at least two "scheme[s] or artifice[s] to defraud" with the requisite particularity.  First, as discussed above, the proposed amended complaint claims that Harrison transmitted to Sushner and the other four LLC members a falsified operating agreement for Innovation Lofts in furtherance of a scheme to secretly increase his equity stake in Innovation Lofts, and earn other undisclosed fees, at the expense of other LLC members.  Am. Compl. ¶¶ 70–78.  If true, each transmittal of the falsified agreement and transfer of LLC funds was a predicate act in furtherance of Harrison's fraudulent scheme to obtain a $1.48 million developer fee and a personal stake in Innovation Lofts, which ultimately sold the Plant 64 property, at the expense of Plant 64 DCMC.  See id. ¶ 77; Philip Morris, 566 F.3d at 1116–17.  Second, the

16

amended complaint charges that from 2017 to 2022, Harrison withdrew at least $3.6 million from Plant 64 DCMC's bank account while sending emails and K-1 forms to the LLC members that falsely stated or implied there was no money for distributions.  Am. Compl. ¶¶ 79–96.  If true, each of Harrison's transmissions of falsified documents to investors and company money to his bank accounts was in furtherance of his fraudulent scheme to steal money from Plant 64 DCMC and cover it up.  These are not merely allegations of breach of contract, as Harrison protests, but specifically alleged instances of wire or mail fraud.  See Defs.' Opp'n at 12.

### iii) Pattern

The last requirement of a plausible RICO claim is a "pattern" of racketeering activity.  In considering this requirement, courts in this circuit look to the six factors laid out in Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995).  These factors are: "[1] the number of unlawful acts, [2] the length of time over which the acts were committed, [3] the similarity of the acts, [4] the number of victims, [5] the number of perpetrators, and [6] the character of the unlawful activity."  Id. (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411–13 (3d Cir.1991)).  If a plaintiff "alleges only a single scheme, a single injury, and few victims it is 'virtually impossible for plaintiffs to state a RICO claim.'"  Western Associates, 235 F.3d at 634 (quoting Edmondson, 48 F.3d at 1265).  Furthermore, "[t]o establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989).  This requirement is referred to as "closed-" or "open-ended" continuity.  Id. at 241.

Although a close call, the Court finds that Sushner has plausibly alleged a "pattern of racketeering" with closed continuity.[4]  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  Id. at 242.  The alleged predicate acts described in the amended complaint are numerous, related, and extend over at least an eight-year period from 2013 to 2021.  See Am. Compl. ¶¶ 73–77, 82–86, 91–96.  Sushner alleges that all the predicate acts were committed by Harrison, aimed at enlarging Harrison's ownership of or revenue from Plant 64 DCMC, and committed by means of mail or wire fraud.  The predicate acts alleged thus "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  H.J. Inc., 492 U.S. at 240 (citing 18 U.S.C. § 3575).

The amended complaint identifies eight alleged victims of Harrison's alleged racketeering activity: the five other LLC members and three other investors who purportedly contributed money but were never made LLC members.  See Am. Compl. ¶¶ 32–40.  Contrary to Harrison's suggestion, the Court may consider allegations that other would-be investors were essentially cheated out of their money.  See Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1050 (7th Cir. 1998); see also Lu v. Lezell, 45 F. Supp. 3d 86, 99 (D.D.C. 2014) (citing Corley).  As the Supreme Court stated in H.J. Inc., "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity."  492 U.S. at 240.  Though Sushner lacks derivative

---

[4]  The Court focuses on closed continuity given that Plant 64 Lofts has now been sold, significantly diminishing the possibility of future racketeering activity.

standing to recover for misappropriation of investor funds before he joined the LLC, the Court finds these allegations relevant to its finding of a RICO pattern.[5]

As to the character of the acts, this factor makes assessment of the proposed RICO claim somewhat of a close call.  Like many courts, the D.C. Circuit has cautioned against interpreting RICO's pattern element in a manner that would enable plaintiffs to frame ordinary business disputes as federal racketeering cases.  See, e.g., Western Associates, 235 F.3d at 637; Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 74 (D.D.C. 2009).  One interpretive tool the Circuit has employed in that regard is determining whether a RICO plaintiff has alleged a single scheme or multiple schemes.  While "a single scheme may suffice for purposes of RICO[,] . . . the number of schemes alleged remains a useful consideration."  See Western Associates, 235 F.3d at 634.  In Western Associates, for example, a limited partner in a real estate venture accused the general partner of using several improper accounting techniques to reduce its profit distributions.  See id. at 631.  The complaint broke out the alleged accounting improprieties into four separate "schemes."  Id. at 632.  Yet, the D.C. Circuit found the plaintiff's subdivision "specious on its face," concluding that the separate schemes were "merely a cosmetic disguise of a single scheme" to "diminish the value of Western's partnership interest."  Id. at 634; see also Edmondson, 48 F.3d at 1265 (finding no pattern where plaintiffs "alleged only a single scheme—to prevent or delay the sale of [a condominium building], or to secure a ransom for allowing the sale to proceed").

_____

[5] Curiously, the proposed RICO claim does not contain allegations concerning conduct by Harrison in connection with a different real estate development project that another court found satisfied RICO's pattern element.  See SS Richmond LLC v. Harrison, 640 F. Supp. 3d 453, 473 (E.D. Va. 2022).

This case has some parallels to <u>Western Associates</u>.  As there, all of Harrison's alleged conduct relates to a single real estate project; the alleged victims are a small set of minority investors; and at its most general level, Harrison's purported overarching goal was to extract money from the venture at the expense of the minority investors.  But closer examination of the complaint allegations here reveals at least two distinct schemes where <u>Western Associates</u> involved a single RICO scheme.  As noted above, one was to increase Harrison's share of the equity in the Plant 64 property at the expense of the other investors through the Innovation Lofts transaction.  <u>See</u> Am. Compl. ¶¶ 70–78.  The other was to siphon fraudulent distributions and fees from Plant 64 DCMC.  <u>See id.</u> ¶¶ 79–106.[6]  These two endeavors had different purposes and were allegedly perpetrated through different means.  Considering these two separate schemes along with the other <u>Edmondson</u> factors, the Court cannot say at the pleading stage of the case that the character of the unlawful activity defeats the pattern element.[7]

The Court finds, accordingly, that the proposed amended complaint plausibly alleges a violation of § 1962(c) of the RICO Act.

### b.  Statute of Limitations

Harrison next contends that the proposed RICO claim is nonetheless futile because the statute of limitations has run.  Defs.' Opp'n at 9.  A defendant "may raise the affirmative defense of a statute of limitations via a Rule 12(b)(6) motion when the facts giving rise to the defense are

---

[6]  While Harrison's alleged effort to fraudulently induce Sushner and other investors to join the LLC by misrepresenting that he had made capital contributions might be considered yet another "scheme," <u>see</u> Am. Compl. ¶¶ 58–69, the Court will not consider these allegations for purposes of the RICO pattern analysis as they sound in securities fraud.  <u>See</u> 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.").

[7]  This could change, of course, should discovery not bear out some of Sushner's allegations of misconduct on Harrison's part.

apparent on the face of the complaint." Gardner v. Erie Ins. Co., 639 F. Supp. 3d 135, 141

(D.D.C. 2022) (quoting Nat'l R.R. Passenger Corp. v. Lexington Ins. Co., 357 F. Supp. 2d 287,

292 (D.D.C. 2005)).  RICO's four-year statute of limitations "begins to run on the date that a

plaintiff discovered, or should have discovered through the exercise of reasonable diligence, the

fraudulent activity in question." Solano v. Delmed, Inc., 759 F. Supp. 847, 852 (D.D.C. 1991)

(internal citations and quotations omitted).  In other words, a plaintiff must have either "actual or

inquiry notice" of the fraudulent activity for the statute of limitations to run. Id. at 853.  Harrison

asserts that the Court can consider this defense on his motion to dismiss because several facts

alleged in the amended complaint constitute "red flags" that should have put Sushner on inquiry

notice of his RICO claim. See Defs.' Opp'n at 9.

The Court will consider Harrison's statute of limitations defense but reject it because he

has not met the higher standard of notice required where there is evidence presented of

fraudulent concealment.  "[W]hen plaintiff shows that defendants committed affirmative acts of

concealment with respect to a potential claim, defendants must meet a more stringent standard to

bar a plaintiff on the ground that he was on notice of his claim notwithstanding the defendants'

attempt to conceal it." Riddell, 866 F.2d at 1491 (citing Hobson v. Wilson, 737 F.2d 1, 35 (D.C.

Cir. 1984)).  In such a case, a defendant "must show something closer to actual notice," given

that "fraudulent concealment by its nature makes discovery of the true facts more difficult, in

part because it obscures the significance of such information as comes to plaintiff's attention."

Id.  Sushner's allegations, accepted as true, state that Harrison doctored operating agreements

and financial projections, Am. Compl. ¶¶ 61–66, 73–74, sent false K-1s to investors every year

for five years, id. ¶¶ 86, 91–96, and lied directly to him and at least one other investor via email,

id. ¶¶ 101–04, all to prevent Plant 64 DCMC members from discovering his alleged

embezzlement and misappropriation of their equity.  In the face of these allegations, Harrison

does not attempt to show that Sushner had anything close to actual notice of a potential RICO

claim.

In any case, the three "red flags" that Harrison says gave rise to inquiry notice largely

concern evidence that Plant 64 DCMC lacked the necessary funding to complete the project or

had not yet started receiving rental income to pay investor dividends rather than evidence that

Harrison was stealing from the LLC.  See Defs.' Opp'n at 9.  And while Sushner still had an

obligation to exercise due diligence to discover facts that were fraudulently concealed, see

Richards v. Mileski, 662 F.2d 65, 69 (D.C. Cir. 1981), the amended complaint alleges that when

Sushner inquired about the lack of distributions via email in 2019 and requested to review Plant

64 DCMC's records in 2021, Harrison rebuffed him.  See Am. Compl. ¶ 56; Pls.' Reply at 14–

15.  Therefore, there is insufficient evidence on the face of the complaint to demonstrate that

Sushner could have discovered these facts earlier despite Harrison's allegedly fraudulent

concealment.[8]

The facts alleged in the amended complaint plausibly state a claim for relief under the

RICO Act and therefore the amendment is not futile.  Accordingly, the Court will grant

Plaintiffs' motion for leave to amend the complaint as to Count 1.  Because the Court finds that

Sushner has plausibly alleged a federal claim, the Court will exercise supplemental jurisdiction

over, and now analyze, the state law claims for fraud, unjust enrichment, embezzlement, and

breach of contract pursuant to 28 U.S.C. § 1367(a).

---

[8]  Harrison's affirmative defense of laches, see Defs.' Opp'n at 10, fails at this stage for the same
reasons as his statute of limitations defense.

### 3.   *Fraud in the Inducement (Count 2)*

Count 2 of the proposed amended complaint alleges that Harrison "fraudulently induced Plaintiff Sushner into investing in Plant 64 DCMC from the outset."  Am. Compl. ¶ 145.  Under D.C. law, "fraudulent inducement to enter a contract requires a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a [party] to enter the contract."  In re U.S. Off. Prod. Co. Sec. Litig., 251 F. Supp. 2d 77, 101 (D.D.C. 2003) (citing Haynes v. Kuder, 591 A.2d 1286, 1290 n.5 (D.C. 1991)).  Sushner originally received a 1.65% interest in the LLC in exchange for his $50,000 investment, just as Harrison promised.  Am. Compl. ¶¶ 58, 60.  He nonetheless alleges that Harrison falsely represented to him and other members that their initial investments were purchasing "an ownership interest in a company . . . that would own and develop the Plant 64 Property outright."  Id. ¶ 146.  Sushner contends that Harrison's promise of a 1.65% interest in the LLC in exchange for $50,000 when "Defendants knew that Plaintiff would ultimately receive a much smaller ownership interest" constitutes fraud in the inducement.  Id. ¶ 149.  But this allegation is controverted by the relevant corporate documents as confirmed by Sushner's own briefing, which acknowledges that "[t]here was never an understanding that Plant 64 DCMC LLC would be going it alone in the project" and that "the operating agreement addresses the possibility that Plant 64 DCMC would assign its interests in the development."  See Pls.' Reply at 9–10 (citing corporate documents).  Accordingly, Sushner has not plausibly alleged a claim of fraudulent inducement, so inclusion of Count 2 in the amended complaint would be futile.

### 4.   *Fraud/Unjust Enrichment (Counts 3–4, 7)*

Sushner pleads fraud and unjust enrichment claims in Counts 3, 4, and 7.  Am. Compl. ¶¶ 153–63, 182–90.  "The District of Columbia recognizes unjust enrichment as a species of

quasi contract" that "permit[s] recovery by contractual remedy in cases where, in fact, there is no contract." See Vila v. Inter-Am. Inv., Corp., 570 F.3d 274, 279–80 (quoting 4934, Inc. v. D.C. Dep't of Emp. Servs., 605 A.2d 50, 55 (D.C. 1992)).  The parties here do not contest that they entered a contractual agreement in April 2012—the Plant 64 DCMC Operating Agreement—that persisted over the relevant period.  See Am. Compl. ¶ 58; Mot. to Dismiss at 21.  Given there is "no need to resort to [a quasi-contract] when the evidence sustains the existence of a true contract," the Court will deny leave to amend with respect to the proposed unjust enrichment claims and treat these claims as ones for fraud only.  See Bloomgarden v. Coyer, 479 F.2d 201, 210 (D.C. Cir. 1973).

But the existence of a contract does not extinguish the possibility of a fraud claim, as Harrison suggests.  See Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1089 (D.C. 2008) ("[A] cause of action that could be considered a tort independent of contract performance is a viable claim.").  "The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation."  Bennett v. Kiggins, 377 A.2d 57, 59 (D.C. 1977).  Where a complaint states these elements of a tort claim independent of the parties' contractual relationship, the tort is actionable.  The Court will therefore address whether each of the proposed fraud counts states a claim.

### a.   Securing the Ownership Interest (Count 3)

Count 3 alleges that Harrison fraudulently secured both his original one-third interest and his additional 6 1/6% interest in Plant 64 DCMC by misrepresenting that he had made certain capital contributions to the LLC.  As for the original ownership interest, Sushner does not meet the pleading requirements to pursue an individual or derivative fraud claim.  And though Sushner

may state a claim for fraud based on Harrison's additional 6 1/6% interest, that claim is barred by the statute of limitations.

The amended complaint states that Sushner and the other LLC members "acceded to Harrison's claim in an initial 33.33% interest" "[i]n reliance on Defendants' false statements" that Harrison had contributed $250,000 and all of his interest in a related company—Plant 64 Development Company—in consideration for his interest in Plant 64 DCMC.  Am. Compl. ¶¶ 64, 155.  However, Sushner was not a member of Plant 64 DCMC at the time Harrison received his initial 33.33% interest.  See id. ¶¶ 42, 60, 64 (noting that CAH gained its interest in the LLC on or before February 2012 and Sushner was accepted as a member in April 2012).  Though Harrison does not raise the issue, Rule 23.1(b)(1) requires the complaint in a derivative action to "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law."  Fed. R. Civ. P. 23.1(b)(1); see also DiLorenzo v. Norton, No. 07-cv-144 (RJL), 2009 WL 2381327, at *3 (D.D.C. July 31, 2009) ("[I]n order to assert claims in connection with all nine [transactions], plaintiff must have been a shareholder at the time of each.").  The same is required under state law.  See D.C. Code § 29-808.03.  Because Sushner was not a member of the LLC at the time of the transaction, he cannot assert an individual or derivative claim based on the allegation that Harrison fraudulently secured his original ownership percentage.

Sushner *was* a member of the LLC when the previously undistributed membership interests were distributed to the existing LLC members *pro rata* in August 2013.  Am. Compl. ¶ 68.  In this distribution of interests, Sushner received an additional .85% interest the company while CAH received an additional 6 1/6% interest.  Id.  Though the facts alleged may state a plausible fraud claim as to Harrison's acquisition of the additional interest, the Court agrees with

Harrison that Sushner and the other members were nonetheless on inquiry notice of this alleged

injury in 2013 and, therefore, the statute of limitations has run on this claim.

Harrison contends that Sushner was on inquiry notice of this claim in 2013 based on

Plant 64 DCMC's lawsuit against Thomas Niemann, the managing member of another related

entity, Plant 64 Acquisition Partners, LLC.  Mot. to Dismiss at 18–19; see also Compl. ¶ 54.  In

that case, Harrison publicly filed the January 2012 Operating Agreement of Plant 64

Development Company, which revealed that Harrison held no interest in it one month before he

purportedly assigned his interest to Plant 64 DCMC.  See Compl. Ex. 4, at 29 (reproducing

Compl. Ex. A, Plant 64 DCMC, LLC v. Plant 64 Acquisition Partners, LLC, No. 13-cv-132

(RWR) (D.D.C. Jan. 31, 2013)).  Sushner cites this litigation in the original complaint as

evidence that Harrison lacked the interest he purportedly assigned, and therefore Harrison's

statute of limitations defense appears on the face of the complaint.  Compl. ¶¶ 47, 68.  If this

lawsuit gave rise to inquiry notice, Sushner only had three years to bring suit.  See D.C. Code

§ 12-301(a)(8).

As Harrison highlights, public records can put a plaintiff on inquiry notice of her claim

and therefore trigger the limitations period.  See Drake v. McNair, 993 A.2d 607, 618 (D.C.

2010); In re Zyprexa Prods. Liab. Litig., 549 F. Supp. 2d 496, 536 (E.D.N.Y. 2008).  In Drake,

the D.C. Court of Appeals held that the plaintiff was on inquiry notice because two deeds,

available in the public land records, "revealed all of the facts necessary to support [the

plaintiff's] claim of fraud."  993 A.2d at 618.  And in Zyprexa, while there were significantly

more events giving rise to inquiry notice than in this case, the court noted that "[e]ven a single

news article can provide sufficiently strong omens to place a plaintiff on notice of the need for

investigation."  549 F. Supp. 2d at 534 (citing LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.,

318 F.3d 148, 155 (2d Cir. 2003) (affirming dismissal because one press article and one lawsuit triggered inquiry notice); In re Glob. Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 200 (S.D.N.Y. 2003) (ruling that a *Fortune* magazine article was enough to put plaintiff investors on inquiry notice); In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) (dismissing the complaint as time-barred because one article and one public filing triggered inquiry notice)).  Moreover, court documents are "inherently public information," and the existence of litigation cannot be considered "concealed."  Id. at 536 (quoting White v. H & R Block, Inc., No. 02-cv-8965, 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004)).

Sushner contends that this case differs from Drake because Harrison did not advise him of the litigation and he "had no reason to go searching for litigation involving Mr. Harrison outside of the statute of limitations period."  Pls.' Opp'n to Mot. to Dismiss at 38.  Be that as it may, Harrison brought the 2013 lawsuit directly on behalf of Plant 64 DCMC.  As a member of the LLC, Sushner may not have had reason to go searching for any lawsuit involving Harrison but he certainly had reason to keep abreast of litigation involving the LLC.  While Sushner has plead sufficient facts to support a finding of fraudulent concealment regarding other claims, thus tolling the limitations period, Harrison cannot be said to have "concealed" litigation to which Plant 64 DCMC was a party while Sushner was a member.  Accordingly, Sushner's claim as to Harrison's allegedly fraudulent enlargement of his ownership interest is time barred.

b.  Procuring the Plant 64 DCMC Development Fee (Count 4)

The Plant 64 DCMC Operating Agreement entitled Harrison to receive a $750,000 development fee from the project.  Am. Compl. Ex. 1, at 6.  Sushner alleges in Count 4 that he and other members of Plant 64 DCMC would not have agreed to the fee had Harrison not concealed the fact that he was "contractually entitled to receive additional developer and

construction management fees from affiliated companies, notably Plant 64 Management LLC and Plant 64 Development LLC." Am. Compl. ¶¶ 159–60. Harrison argues that these allegations fail to state a claim because the operating agreement explicitly permitted him to receive income and fees from other sources. See Mot. to Dismiss at 23. He points to section 11.11 of the agreement, which states: "Except as expressly provided in this Agreement, any of the Members or the Affiliates may engage in, or possess an interest in, other business ventures of every nature and description, independently or with others, whether or not such enterprises shall be in conjunction with or in competition with any activities of this Company . . . . Nothing contained herein shall be construed . . . to limit in any manner the Members in carrying on their respective businesses or activities." Am. Compl. Ex. 1, at 25–26. This argument misses the mark. That Harrison may have been generally entitled to engage in other business ventures, even in competition with the LLC, did not permit him to conceal material facts from investors. And Sushner has adequately alleged that Harrison's nondisclosure of his receipt of additional fees for identical work on the project influenced Sushner's decision to agree to the $750,000 fee set forth in the agreement. The existence of section 11.11 may have alerted the other members to the possibility that Harrison might be paid by related companies, which could go to materiality, but it does not defeat the claim outright at the pleading stage of the case.

### c.  Procuring the Innovation Lofts Fee and Interest (Count 7)

Sushner has also alleged the requisite elements of common law fraud with respect to Count 7, which claims that on August 7, 2013, Harrison emailed the members of Plant 64 DCMC a deliberately doctored copy of the Innovations Lofts operating agreement, which contained multiple false representations. See Am. Compl. ¶¶ 73–74, 184–88. In reliance on these false documents and statements, Sushner alleges that the LLC members allowed Harrison

to execute a deal in which Plant 64 DCMC gave up its right to purchase the Plant 64 property in exchange for a vastly reduced share of the project.  See id. ¶¶ 73, 188–90.  These allegations state the elements of a common law fraud claim.  And because Sushner has plausibly alleged that Harrison fraudulently concealed the true Innovation Lofts operating agreement, see id. ¶¶ 73, 78, the statute of limitations would not bar this claim if the facts alleged prove to be true.  Accordingly, the Court finds that the fraud claim in Count 7 would survive a motion to dismiss.

### 5.  *Embezzlement (Counts 5-6)*

Sushner pleads two counts of "embezzlement" based on Harrison's allegedly fraudulent diversion of initial investor funds from 2011 to 2012 (Count 5) and the allegedly unlawful distributions starting in 2017 (Count 6).  Id. ¶¶ 164–81.  As Harrison points out, "embezzlement" refers to a "criminal offense, not a civil claim."  Defs.' Opp'n at 6; see also D.C. Code § 22-3211.  While criminal acts are the basis of RICO, they are not a proper basis for a civil complaint based in state common law.

The amended complaint references a claim for conversion and breach of fiduciary duty for Harrison's "diversion of distributable revenues from the operation of The Plant 64 Project to themselves," see Am. Compl. ¶ 22(e), but neither cause of action appears in Plaintiffs' enumerated counts.  Nor does Sushner directly respond to these pleading deficiencies in his briefing.  The Court will therefore deny leave to file the proposed amendment as to Counts 5 and 6 without prejudice.

### 6.  *Breach of Contract (Count 8)*

Finally, Count 8 of the amended complaint alleges that the Plant 64 DCMC Operating Agreement entitles Sushner and the other LLC members to annual preferred returns from the net profits of the venture and that Harrison failed to make these payments despite the LLC's

profitability from 2017 to 2020.  Id. ¶¶ 191–95; see also id. ¶¶ 82–86, 92–96.  For a breach of contract claim, Sushner must plausibly allege "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) (citing San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)).  The amended complaint pleads each of these elements: that Harrison and Sushner had a valid contract; that the contract obligated Harrison to pay investors preferred returns; that Harrison breached the duty by failing to pay any returns to Sushner; and that Sushner is owed damages in the amount of the breach.  Am. Compl. ¶¶ 191–95.  Harrison does not appear to contest that the contract calls for the payment of preferred returns and that none were paid.  He instead concedes multiple times that "Plaintiffs could bring breach of contract claims if he could plausibly allege such claims." See Defs.' Opp'n at 3; see also Mot. to Dismiss at 21–22; Defs.' Reply at 6–7.  Because Sushner has plausibly alleged breach of contract, Count 8 would survive a motion to dismiss and thus the amendment is not futile as to this count.

*   *   *

In sum, Harrison has failed to meet his burden to show that the amended complaint should be denied as unduly prejudicial or the product of undue delay and the Court finds that Sushner has plausibly alleged four claims (Counts 1, 4, 7, and 8) and thus granting Plaintiffs' motion for leave to amend the complaint would not be futile as to those counts.

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [Dkt. No. 19] Plaintiffs' motion for leave to file an amended complaint is granted in part and denied in part; it is further

**ORDERED** that Counts 1, 4, 7, and 8 of the Amended Complaint will be permitted to proceed, while Counts 2, 3, 5, and 6 shall be stricken from the amended complaint; it is further

**ORDERED** that [Dkt. No. 11] Defendants' Motion to Dismiss shall be denied as moot; it is further

**ORDERED** that [Dkt. No. 10] Plaintiffs' motion to reconsider the stay of discovery is denied as moot; it is further

**ORDERED** that Defendants shall answer or otherwise respond to the amended complaint by October 30, 2023.

**SO ORDERED**.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 28, 2023